OPINION OF THE COURT
Edwin Kassoff, J.
These are three proceedings pursuant to article 81 of the Mental Hygiene Law seeking the appointment of guardians for the property management and personal needs of the alleged incapacitated persons, Hazel Ehmke, Neil Ehmke, and Nancy Ehmke. The parties have agreed that these proceedings would be jointly tried and that this court would issue one decision addressing all three proceedings.
The evidence adduced at the hearing revealed that 47-year-old Nancy Ehmke resides with her parents, Hazel and Neil Ehmke, in their home in Jamaica Estates, New York. Nancy is currently unemployed. In the past she worked as a part-time teacher in Great Neck and as a piano tutor. Her most recent job was as a cashier at Pergament’s Department Store. Neil Ehmke is an 81-year-old retired school teacher. Approximately two years ago he suffered a fall and broke his hip. He is unable to walk without the assistance of crutches. His wife, 85-year-old Hazel Ehmke, is in frail condition, and it is difficult for her to walk. All three respondents appear to be in complete command of their faculties and are intelligent, well-learned people.
The Ehmkes were referred to Protective Services for Adults (PSA), a division of the Department of Social Services, on August 1, 1993, after a neighbor observed Nancy and Hazel *611 Ehmke rummaging through garbage cans. In addition, it was reported that the Ehmkes resided with 10 dogs and that their house had no heat.
Dr. Ralph Speken performed a psychiatric evaluation on Neil and Hazel Ehmke, on March 8, 1994, at their home. In his affirmation, he stated that the house was entirely filthy and was cluttered with books, papers and other family objects. He also noted that there was a marked infestation of flies in the kitchen, and that there were 10 dogs in the house. Dr. Speken stated that for some time during the interview, Hazel Ehmke refused to give any information about herself. She appeared to be crying and shouted that she found Dr. Speken’s questions "foolish”. Dr. Speken further noted that Hazel Ehmke’s judgment regarding what is needed to preserve her home and responsibly manage her finances was impaired. She felt that her daughter, Nancy, adequately takes care of the house. Dr. Speken noted that Hazel Ehmke repeatedly stated that she saw "nothing wrong” with the condition of the house, even though the house was extremely filthy. Dr. Speken also explained that while Neil Ehmke realized his home was filled with debris and infested with flies, he was unable to get his wife and daughter to allow the necessary cleanup. Dr. Speken observed that Neil Ehmke was alert and lucid and showed no indication of any thought disorder. However, due to the conditions in the house he opined that Neil was in danger of becoming homeless.
Dr. Christopher Bailey performed a psychiatric evaluation on Nancy Ehmke on April 8, 1994. In his affirmation, he stated that she has steadfastly refused a heavy-duty cleaning of the house and a home attendant for her parents. When faced with the possibility of eviction because of the conditions in the house, Dr. Bailey noted that Nancy did not formulate any plan for relocation and still refused a heavy-duty cleaning of the house. According to Dr. Bailey, Nancy maintained that the house was not a health risk. In addition, he noted that she still had not obtained employment, even though she repeatedly told her caseworker that she was getting a job. Dr. Bailey opined that she is an extremely poor caretaker for her parents, herself and their collective environment and she contributed to the unliveable conditions in the house by not allowing anyone to correct them. As a result, the entire family may have to relocate. In addition, Dr. Bailey stated that Nancy has poor judgment, lacks insight into the consequences of her actions and without treatment, her condition is not likely to *612 improve. Due to her mental illness, Nancy Ehmke does not understand and appreciate the consequences of her inability to provide for her parents’ personal needs.
Pursuant to Mental Hygiene Law § 81.09, on December 20, 1994, a court evaluator was appointed to investigate the home life and financial status of the Ehmkes and to recommend whether or not a guardian should be appointed for their personal needs and property management. The court evaluator met with the Ehmkes on January 13, 1995 at their home for approximately three hours. In his report, he indicated that the living conditions in the home are poor at best. He noted that several panes of glass are missing from the French doors, and there are piles of boxes in the living room and dining room. The Ehmkes explained that the boxes were there as the result of a flood, but the court evaluator observed no signs of flooding. In addition, he stated that there are nine dogs in the home, and the bathrooms throughout the house are in disrepair. Water must be poured into the toilets in order for them to flush properly. Moreover, the court evaluator noted that the Ehmkes used small, electric space heaters measuring 6 by 6 by 6 inches in the living room and in some other parts of the house, which create a fire hazard.
In his report, the court evaluator also explained that the Ehmkes do not properly manage their finances. The Ehmkes currently have a mortgage which requires the payment of $1,500 per month. Moreover, they owe thousands of dollars to various credit card companies as well as to Con Edison, and to the City of New York for real property, water, and sewer taxes. They cannot pay their bills and are unable to afford heating oil for their house. As a result, they are forced to rely on some small, electric space heaters. The Ehmkes told the court evaluator that their house is in such disrepair because they cannot afford to maintain it. The court evaluator opined that the Ehmkes would benefit from home attendant care and are in need of money management assistance. He recommended that a guardian be appointed for them.
Article 81 of the Mental Hygiene Law allows a guardian to be appointed for one’s personal needs, property management, or both (Mental Hygiene Law § 81.02 [a]). Article 81 attempts to create a guardianship system that is tailored to meet the specific needs of the individual by taking into account the personal wishes, preferences, and desires of the alleged incapacitated person (Mental Hygiene Law § 81.01). The statute is thus based on the concept that the "needs of persons with *613 incapacities are as diverse and complex as they are unique to the individual” (Mental Hygiene Law § 81.01). As a result, the guardian is given only those powers which he needs and no more. In this way, article 81 seeks to foster the least restrictive form of intervention consistent with an individual’s self-determination (see, Mental Hygiene Law § 81.02 [a] [2]).
Article 81 provides a two-prong test for determining whether a guardian should be appointed for an individual. Under section 81.02 (a) of the Mental Hygiene Law, the court can appoint a guardian for a person if it first determines the appointment is necessary to provide for the personal needs or property management of the person. In reaching its determination for this first prong, the court considers all evidence including, but not limited to the report of the court evaluator and "the sufficiency and reliability of available resources” (Mental Hygiene Law § 81.02 [a] [2]). To satisfy the second prong, the individual must agree to the appointment or must be incapacitated (Mental Hygiene Law § 81.02 [a] [2]). Under section 81.02 (b), a determination of incapacity must be based on clear and convincing evidence that the person is likely to suffer harm because he is unable to provide for his personal needs and/or property management, and he cannot adequately understand and appreciate the nature and consequences of his inability. The burden of proof is on the petitioner to prove that a person is incapacitated by clear and convincing evidence (Mental Hygiene Law § 81.12 [a]). This means evidence that shows a high degree of probability that the alleged incapacitated person is in fact incapacitated.
To decide for the petitioner, it is not enough to find that the preponderance of the evidence is in petitioner’s favor. A party who must prove the case by a preponderance of the evidence only need show that the evidence supporting the case more closely represents the allegations than the evidence which is opposed to it. However, under article 81, the petitioner must establish the case by clear and convincing evidence; that is, he must convince the court that the evidence makes it highly probable that what is claimed is actually so. It is not necessary for the petitioner to establish the allegations beyond a reasonable doubt, which requires a higher degree of persuasion.
The law presumes every person to have capacity to manage his or her own affairs but the evidence may overcome that presumption. Evidence was presented at the hearing which showed that the Ehmkes’ home is unliveable and that the *614 Ehmkes cannot properly manage their financial affairs. They are unable to afford the basic necessities of life. This evidence overcomes the presumption regarding their capacity.
Article 81 further requires the court to give "primary consideration” to one’s functional level and functional limitations in making a determination of incapacity (Mental Hygiene Law § 81.02 [c]). This functional evaluation considers how an individual manages his activities of daily living, such as eating, shopping, dressing, housekeeping, and money management (see, Mental Hygiene Law § 81.03 [h]). Specifically, the court may look at one’s physical ability to dress and undress; ability to buy and prepare food; cleanliness of environment; ability to walk and climb stairs; access to helpful resources, such as relatives, physicians, and transportation; and emotional factors, such as loneliness and anxiety.
In addition, even if all the elements of incapacity are present, the comments by the Law Revision Commission emphasize that a guardian should only be appointed as a last resort and should not be imposed if available resources or other alternatives will adequately protect the person (see, L Rev Commn Comments following Mental Hygiene Law § 81.02, McKinney’s Cons Laws of NY, Book 34A, 1995 Pocket Part, at 301).
The court first notes that it had the opportunity to listen to and observe Neil and Nancy Ehmke testify firsthand. The court finds that there is clear and convincing evidence that the Ehmkes are likely to suffer harm because they cannot provide for their personal needs and are unable to adequately understand and appreciate the nature and consequences of this inability. Neil and Hazel Ehmke are unable to shower, shop, or dress without the assistance of others. In addition, their house is in need of substantial repair and cleaning. The house is freezing as the Ehmkes have no oil to heat their home in this bitterly cold weather and must rely instead on some small, electric space heaters that are not in all rooms. In addition, the plumbing is in a state of disrepair. The toilets do not flush automatically, but rather, the Ehmkes must first add water to the toilet in order for it to flush. There is an infestation of flies in several rooms in the house, including the kitchen. The house is filthy with piles of boxes lying in the dining room and living room, creating a fire hazard. The floor is unswept, and the carpet is dirty. There is a leaky roof and a leaky supply pipe in the water closet in the first story bathroom. Furthermore, there are strong odors in the house since *615 the Ehmkes reside with at least nine dogs. The Ehmkes have thus far refused to allow a cleaning service into their house. These conditions make the house an unhealthy and dangerous place to live, particularly in light of Neil Ehmke’s dependence on crutches and Hazel Ehmke’s extremely frail condition. Moreover, their daughter Nancy is unable to provide for her own or her parents’ personal needs. Although a member of the household, Nancy never made any attempt to remedy the conditions in the house.
The court also finds that there is clear and convincing evidence that the Ehmkes are likely to suffer harm because they cannot provide for their property management and are unable to adequately understand and appreciate the nature and consequences of this inability. Neil and Hazel Ehmke have a combined monthly income of $2,027. They also receive approximately $35 per month in food stamps. Nancy Ehmke has no financial resources of her own. They have debts that they are unable to pay with the above income. They owe approximately $16,000 on various credit cards, which charge an average of 20% interest, there is a current mortgage bill of $1,500 per month, they owe $1,070.28 to Con Edison, and $5,978.31 in real property, water and sewer taxes. Their income cannot meet these expenses and cannot pay for the needed repairs to the house. Indeed, Nancy Ehmke told the court evaluator that the house was in such disrepair because of the lack of money. Furthermore, Neil Ehmke has been unable to purchase prescription medication because of the lack of funds. Their situation is so difficult that they cannot afford to pay the above expenses as well as provide for food and clothing.
The court finds that the Ehmkes suffer from no mental impairment, and that they are intelligent individuals, capable of making themselves understood. However, the focus of article 81 is on one’s functional limitations and whether or not an individual will suffer harm as a result of these functional limitations. An individual’s intelligence is not a deciding factor in an article 81 proceeding.
In view of the foregoing, the court will appoint the New York Foundation for Senior Citizens, Guardian Services, Inc. as the guardian for the personal needs and property management of Neil, Hazel, and Nancy Ehmke. The court will waive the filing of a bond by the guardian. Since article 81 allows the court to fashion a guardianship that is tailored to the individual needs of the alleged incapacitated person, and *616 provides for the least restrictive form of intervention, the guardian shall allow the Ehmkes to do as much as they possibly can on their own. For example, after listening to the evidence, the court feels that the Ehmkes could pay their own bills and write out their own checks on an account established by the guardian.
The court grants the guardian the power to determine who shall provide care for the Ehmkes; to make decisions regarding the social environment and other social aspects of the Ehmkes’ life; to apply for government and private benefits; to consent to or refuse generally accepted routine medical or dental treatment; to obtain the appropriate level of home care services; to marshal the income and the assets and manage the real property of the Ehmkes; to pay such bills as may be reasonably necessary to maintain the Ehmkes; to authorize access to or release of confidential records; to invest funds with the same authority as a trustee pursuant to EPTL 11-2.3, the Prudent Investor Rule; to defend or maintain any civil judicial proceeding; to retain counsel and/or an accountant subject to court approval of fees; to pay funeral expenses; and to pay bills after death if incurred prior to death, and if authority to pay any such bill would otherwise have existed.
Medicaid should be obtained for Neil and Hazel Ehmke, and the court agrees with the opinion of the social worker employed by PSA, Kojo Kari-Kari, that there should be an immediate application for welfare benefits for Neil, Hazel, and Nancy Ehmke.
The court further directs that the guardian shall arrange for the appropriate New York City agencies to perform a heavy-duty cleaning of the Ehmkes’ house and provide them with oil in order to heat their home. In addition, the guardian shall arrange for home attendants for Neil and Hazel Ehmke, allowing their daughter Nancy to obtain employment since she will then not have to care for her parents during the day. The guardian will have no authority or power whatsoever to place any of the incapacitated persons into any kind of structured setting, such as a nursing home, without further leave of the court.
The court looks forward to the time when the Ehmkes will no longer need a guardian for their personal needs and property management. As soon as the living conditions in the *617 Ehmkes’ house improve, there is oil to heat the home, the threat of foreclosure is removed, and a suitable budget is proposed that they can handle on their own, the guardian shall make an application to this court to be discharged and allow the parties to manage their affairs.